UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Richard M. Picinich,

                                        Plaintiff,

          -v.-                                    5:01-CV-01868
                                                  (NPM)

United Parcel Service, Jim Grover,
Brendan Canavan, Jeffrey Wilson and
United Parcel Service of America, Inc.,

                                        Defendants.

APPEARANCES:                    OF COUNSEL:

FOR THE PLAINTIFF:

Legal Services of Central New York      David Thomas Hutt
472 South Salina Street                 Susan M. Young
Suite 300
Syracuse, New York 13202

FOR THE DEFENDANTS:

Pitney, Hardin, Kipp & Szuch            Adin C. Goldberg
P.O. Box 1945                           Jonathan J. Harper
Morristown, New Jersey 07962-1945


Neal P. McCurn, Senior District Judge

                MEMORANDUM-DECISION and ORDER

     A non-jury trial was held in this action from September 27, 2004 until

October 4, 2004.  The following consists of the court's findings of fact and

                                        1

conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

### *Findings of Fact*

This matter was previously before the court on a motion for summary judgment by defendants and a cross motion for partial summary judgment by plaintiff.  The court discussed the facts of record as they existed at that time in some detail.  See Picinich v. United Parcel Service, 321 F.Supp.2d 485, 490-497 (N.D.N.Y. 2004) ("Picinich I").  To avoid repetition, the court adopts the facts as set forth in Picinich I.  The following additional facts were established or further clarified at trial.

Plaintiff, Richard M. Picinich ("Picinich"), is a former employee of defendant, United Parcel Service ("UPS"), most recently as a "Preload Manager" at its facility in Utica, New York.  Picinich began his employment with UPS at age 17, while still in high school.  Aside from a few days in April 2000, Picinich last worked at UPS on January 21, 2000, when he was removed from work by his physician due to a back injury.  According to Picinich's medical records and the testimony of his treating physician, Jeffery Kahn, M.D. ("Dr. Kahn"), Picinich has been unable to work in any position, even with an accommodation, during the following time periods: January 21, 2000 until April 10, 2000; April 14, 2000 until January 5, 2001; June 26, 2001 until August 28, 2001; March 12, 2002 until April 22, 2002; and February 27, 2002 until March 14, 2003

### *I.  Picinich's April 2000 Return to Work*

Robin Fey, R.N. ("Fey"), Occupational Health Manager for UPS, visited Dr. Kahn at his offices in early March 2000.  During the meeting, Fey informed Dr. Kahn that the position available for Picinich at UPS was in preload at the Utica facility.  See Tr. 286:14-23; Defs.' Ex. 192.  Dr. Kahn testified, and his records

reflect that during the meeting, Fey expressed an understanding "that any restrictions that we may impose will likely be present on a permanent basis."  Pl.'s Ex. 83.  <u>See also</u> Tr. 324:1-7.  Fey received a copy of this report.  <u>See</u> Pl.'s Ex. 83. <u>See also</u> Tr. 875:4-6; 899:2-8.

On March 15, 2000, Picinich underwent an independent medical exam ("IME"), conducted on behalf of CIGNA, the disability insurance carrier for UPS at that time.  By letter dated March 31, 2000, CIGNA case manager, Karen Quinlan ("Quinlan"), notified Picinich that based on the results of the IME, UPS indicated that they could "make reasonable accommodations in order for [him] to successfully return to work."  Pl.'s Ex. 14.  Quinlan further notified Picinich that Dr. Ferraraccio, the physician who performed the IME, reported "[i]f work were available where [Picinich's] lifting could be limited to no more than 10 to 12 pounds on an occasional basis where he did not have to bend, twist, stoop, push or pull repetitively, and where he had complete freedom to change position from sitting to standing at will, I would feel this to be satisfactory."  Id.  Fey testified that the IME results reflected Picinich's work restrictions were temporary, and that as of March 30, 2000, she also understood from Dr. Kahn's reports that the restrictions were temporary.  <u>See</u> Tr. 869:1-20.  In fact, Fey testified, she did not understand Picinich's restrictions to be permanent until some time later, in January 2001.  <u>See</u> Tr. 878:19-879:7.

On April 3, 2000 Dr. Kahn notified CIGNA by way of a letter addressed to Quinlan, that the following restrictions would apply to Picinich's return to work:

1.     He is restricted from driving any more than 30 minutes at a
       time.
2.     He may not bend or lift below the waist for any purpose.
3.     He is limited to periods of no more than 30 minutes of sitting,

standing, or walking continuously, with alternatives for changes
in body position.

4.     He may lift no more than 10 pounds on an occasional basis
between waist and shoulder level.

5.     He is specifically prohibited from kneeling, stooping, bending,
climbing ladders, or twisting.

Pl.'s Ex. 69.  See also Tr. 326:7-327:17.  Dr. Kahn further notified CIGNA that

"[i]t is anticipated that these restrictions will remain on a permanent basis."  Id.

Moreover, Dr. Kahn's letter to CIGNA reflects his concerns about the Preload

Manager position, Picinich's position at UPS, and the high risk of re-injury related

to same, specifically the training of new employees regarding loading and lifting

techniques, of which, Dr. Kahn stated, "he is not physically capable presently, nor

do I feel he will be capable of performing in the future."  Pl.'s Ex. 69.  Although

Fey testified that she had contacts with Quinlan, and that prior to testifying she had

seen Dr. Kahn's April 3, 2000 letter, she did not state whether she read said letter

prior to Picinich's return to work in April 2000.  See Tr. 906:2-23.  Nonetheless,

Fey's notes reflect that she spoke with Quinlan on April 5, 2000, and that they

discussed Quinlan's conversation with Dr. Kahn of that day regarding his concerns

about Picinich's return to work as Preload Manager.  See Defs.' Ex. 192.

At the request of defendant, James Grover ("Grover"), Human Resources

Manager for the Upstate New York UPS District in April 2000, Picinich attended a

meeting at a UPS facility near Syracuse on April 7, 2000.  See Pl.'s Ex. 15.

Present at the meeting with Picinich were Grover and Fey, as well as Pat

McLaughlin and Pete Lomanto, the Workforce Planning Manager, and Picinich's

division manager, respectively.  Defendant, Brendan Canavan ("Canavan"), who

was District Manager at the time, was not present at the meeting.  Although

Canavan testified that he knew Picinich was returning to work in April 2000, he

4

also testified that he never discussed same with Grover, and that Grover, not Canavan, made the decision that Picinich would return as the Preload Manager. See Tr. 549:2-550:13.  Grover, on the other hand, testified that while he made the decision about which position Picinich would return to, he did in fact discuss this with Canavan first.  See Tr. 619:13-620:9.

According to Grover, the UPS ADA procedure had not yet commenced as of April 7, 2000, because Picinich had not requested an accommodation, and because UPS understood Picinich's restrictions to be temporary at that time.  See Tr. 624:15-628:3.  Grover further testified that in order for the ADA procedure to begin, an employee must use the term "reasonable accommodation" in their request.  See id. at 562:8-12.  Nonetheless, Grover testified, he is not as familiar with the ADA process as Fey is because it is the duty of the Occupational Health Manager or the Workforce Planning Manager at UPS to commence the process, not the Human Resources Manager.  See Tr. 652:3-12.

Prior to the April 7 meeting, on March 30, 2000, Fey notified Grover in writing of the results of the IME, as follows:

```
SIT, STAND, WALK              able to change at will
LIFTING                       carrying 10lbs occasionally
CLIMBING, KNEELING, & CRAWLING  occasionally
RESTRICTIONS TEMPORARY 8 - 12 WEEKS (from IME date)
```

Defs.' Ex. 22.  See also Tr. 651:8-652:2.  Also prior to the meeting, Fey and Grover reviewed Dr. Kahn's work restrictions for Picinich.  See Tr. 633:24-634:4.

During the April 7, 2000 meeting, Grover told Picinich that the Preload Manager position was available for him, and that UPS could accommodate his work restrictions.  See Defs.' Ex. 25.  See also Tr. 290:19-23.  Grover also directed Picinich to work within those restrictions, and later testified that he believed such

direction to be a form of accommodation.  See Tr. 655: 12-16.  Also, Fey told Picinich at the meeting, "[w]e are going to accommodate your restrictions." Tr. 873:4-9.  Fey's notes from the meeting reflect that Pete Lomanto specifically told Picinich not to touch a package or to open trailer doors, but to have someone else do those things for him.  See Defs.' Ex. 25.  Picinich was further informed that a UPS employee would be available to assist him.  See Tr. 621:6-18; 657:21-658:1; 291:2-7.  That employee was Scott Briggs ("Briggs"), who was a part-time Preload Supervisor.  See id.  According to Picinich's testimony, he was specifically told that Briggs would be working a full-time shift in order to assist him.  See Tr. 53:11-20.

On April 10, 2000, Dr. Kahn received a facsimile copy of Picinich's job description from Karen Quinlan at CIGNA.  See Tr. 329:2-15.  The facsimile cover sheet includes the following statement: "Robin Fey asked that I forward a copy of Mr. Picinich's job description."  Pl.'s Ex. 70.  Absent from this description is any mention of bending, sitting, stooping, climbing, standing or walking, or lifting packages.  See id.  However, each of these functions are listed as essential to the Preload Manager position in the UPS Essential Job Functions Index.  See Defs.' Ex. 40.  Grover testified that he viewed the functions of lifting packages, bending, twisting, and crouching as essential to the Preload Manager position.  See Tr. 621:19-622:5.  Grover then admitted to giving contrary testimony at his deposition, but explained that he meant Picinich would not be capable of performing those functions within his restrictions.  See id. at 622:6-623:2.  In fact, Grover testified that Picinich "[could] direct and manage a building without doing those - - those particular physical items."  Tr. 623:3-5.  While Dr. Kahn testified that there was a discrepancy between the job description he received from CIGNA, and the

description conveyed to him by Fey, the latter of which was of a more physically demanding position, he felt that Picinich could perform the functions of the job as were described by CIGNA.  See Tr. 330:8-331:2.  Therefore, on April 10, 2000, Dr. Kahn released Picinich to work within certain restrictions, which read as follows:

1.    No bend or lift below the waist.
2.    No more than 30 minutes of standing, walking, or walking continuously.[1]
3.    No lifting > 10 # on an occasional basis between waist/shoulder level.
4.    No kneeling, stooping, bending, climbing or twisting.  No driving > 30 minutes.

Pl.'s Ex. 114.

When Picinich returned to work as the Preload Manager on April 11, 2000, he discovered that Briggs, the Preload Supervisor assigned to assist him, was wearing a knee brace.  Picinich testified that Briggs sat in a chair during his entire shift, leaving Picinich to perform the required physical tasks of the preload operation.  See Tr. 54:18-55:21.  Briggs testified that he underwent knee surgery approximately three weeks prior tp Picinich's return to work, and that he was physically unable to assist Picinich with any of his job duties.  See Tr. 269:6-270:22.  Briggs testified that he did not notify Grover, Fey, Pete Lomanto or Pat McLaughlin that he was going to have knee surgery.  See Tr. 273:18-274:12.  Grover testified that even at the time of the April 7, 2000 meeting, he was unaware that Briggs had undergone knee surgery.  See Tr. 658:2-4.

When Picinich returned to work, he completed a full time shift,

_____

[1] At trial, Dr. Kahn testified that the second restriction should also have included sitting.  See Tr. 331:13-21.

7

approximately ten to eleven hours, although Briggs only worked a part time shift, approximately five hours.  <u>See</u> Tr. 278:5-16.  Grover acknowledged that a part-time supervisor would not typically work the entire full-time shift, although they sometimes work double shifts.  <u>See</u> Tr. 623:16-21; 634:15-18.  Nonetheless, Grover testified that he did not inquire with anyone at the Utica preload about the availability of personnel on the shift Picinich was expected to work.  <u>See</u> Tr. 623:6-9.

Picinich testified that during his return to work in April 2000, he spent a great deal of time on his feet, which caused his back to "flar[e] up" and that he was required to weave his way through the floor, resulting in him performing a lot of twisting movements.  <u>See</u> Tr. 55:8-18.  Also during his return to work, Picinich testified, while he was talking to another employee on the floor, a package jumped over the lip of a slide and collided against him, throwing him into a package cart. <u>See id.</u> at 55:18-21.  On April 14, 2000, Dr. Kahn removed Picinich from work, citing a worsening of his condition, and finding him temporarily totally disabled once again.  <u>See</u> Pl.'s Ex. 83; Tr. 336:18-337:7.

## II. Picinich's Request to Transfer to Vacant Positions & UPS' Offer of the Yard Controller/Dispatch Position

On January 5, 2001, Dr. Kahn informed Fey that he was releasing Picinich to work within the following restrictions:

> No sitting, standing, driving or walking more than 25 minutes at a time.
> No bending, lifting, carrying, climbing, stooping, kneeling, twisting or squatting on a permanent basis.
> He must be placed in a work environment where he has an adequate space and safe area to be able to perform prone extensions on an hourly basis or more frequent as needed.
> He must be afforded the opportunity to change positions every 25

8

minutes as described above.

Pl.'s Ex. 23.  See also Tr. 346:18-347:1; Tr. 296:22-297:7.  Dr. Kahn further stated that these restrictions "would effectively place [Picinich] in a sedentary position, with no physical handling activities of any type.  I consider these restrictions and limitations to be present on a permanent basis."  Pl.'s Ex. 23.

Contemporaneously with Fey's receipt of Dr. Kahn's restrictions, Picinich spoke to Fey and asked for a reasonable accommodation.  See Tr. 880:2-16.  Fey testified that on January 5, 2001, the UPS ADA procedure began for Picinich, ostensibly because of his request.  See Tr. 297:14-21.  Defendant, Jeffery Wilson ("Wilson"), who replaced Grover as the District Human Resources manager in October 2000, testified that he was involved in the entire ADA process for Picinich, and that he understood the process to commence only after an individual makes a request for reasonable accommodation.  See Tr. 682:7-10; 682:14-17; 682:22-683:2; 728:16-23.  Dave Matt ("Matt"), then Workforce Planning Manager for the Upstate New York district, testified that Wilson had the ultimate and final responsibility for the ADA process in the district.  See Tr. 245:1-4.

The second step, collection of medical information, commenced shortly after Picinich's request for an accommodation, when Matt issued a letter to Picinich on January 9, 2001, accompanied by certain medical forms to be completed by his physician.  See Tr. 880:17-881:3; 236:16-25; Defs.' Ex. 43.  See also Pl.'s Ex. 67.  Although, Dr. Kahn testified, his office mailed the completed forms to UPS on January 12, according to Fey, the forms were not received by her until January 18, 2001.  See Tr. 350:24-351:7; 886:2-887:14.  After Fey reviewed the forms, she forwarded them to her and Matt's counterparts in the region for a determination as to whether Picinich was disabled under ADA guidelines.  See Tr. 887:15-888:12.

Such an evaluation and determination at the region level is the third step of the UPS ADA procedure.  <u>See</u> Tr. 729:1-2; Pl.'s Ex. 67.  In response to a request by the region for more information, Matt issued another letter to Dr. Kahn on January 30, 2001 asking for same.  <u>See</u> Tr. 888:13-889:7; 238:20-239:8; Pl.'s Ex. 74; Pl.'s Ex. 115.  The letter states, "United Parcel Service needs to know, from a medical standpoint, exactly what kind of work is [Picinich] allowed to do.  We need to know this before he is able to come back to work so we can place him within any restrictions he may have."  Pl.'s Ex. 74; Pl.'s Ex. 115.  Two days later, Dr. Kahn responded to Matt in writing.  <u>See</u> Tr. 352:21-353:8; Pl.'s Ex. 75.  Dr. Kahn's letter to Matt states, among other things, "You have asked that I submit a letter to you stating physical capabilities rather than restrictions.  You understand that I am effectively rewording within the same context those guidelines set forth four weeks ago."  Pl.'s Ex. 75.  The letter continues, setting forth Picinich's capabilities as follows:

> It is my opinion within a reasonable degree of medical certainty that this individual can work in a **full time sedentary** position within the following parameters:
> He may alternate between sitting, standing and walking, with none of those activities performed more than 25 minutes at a time, prior to change in position, and may drive up to 25 minutes from his home to work place.
> He may utilize standard office equipment at his desk such as a calculator, computer or telephone.
> He must be allowed to work in an environment where there is a safe area to allow him to perform exercises previously described at least on an hourly basis for a few minutes, or more frequently if necessary.
> I have been consistent in informing your organization that this individual may not perform any bending, lifting, carrying, climbing, stooping, kneeling, twisting, or squatting at any time.  He may not perform any physical handling type activities, drive a vehicle other

> than his own vehicle to and from work, or climb more than a few
> stairs to access his work space, with full restriction on repetitious stair
> climbing as an integral part of work activities.

Id. (emphasis in original).  Upon receipt of Dr. Kahn's letter, Matt forwarded it to

Fey, who forwarded same to her counterpart at the region.  See Tr. 889:8-890:1;

215:7-24; Pl.'s Ex. 75.

Shortly after the first mailing of information to the region, on or about

January 19, 2001, Picinich asked Fey if he could transfer to another district, to

which Fey replied that she did not know but would ask.  See Tr. 298:6-12; Defs.'

Ex. 192.  Fey testified that she did not recall whether she ever inquired with

anyone about Picinich's request for a transfer outside of the district.  See id. at 13-

15.

Sometime in March 2001, the region made a determination that Picinich was

disabled pursuant to the UPS ADA policy.  See Tr. 890:2-9.  On March 20, 2001,

Matt issued a letter to Picinich informing him that a preliminary determination had

been made that he "may be eligible for a reasonable accommodation pursuant to

the [ADA]" and scheduling a meeting for April 4, 2001 to discuss specific

accommodations requested by Picinich.  See Defs.' Ex. 51.  Defendant Wilson was

aware that this meeting was to occur.  See Tr. 683:22-684:2.  Fey understood the

purpose of the meeting to be for Picinich to make suggestions as to how UPS could

accommodate him in his then current position of Preload Manager.  See Tr.

890:10-19.  While Matt understood the purpose of the meeting to be for Picinich to

provide a list of things he could do so that he could be accommodated in *any*

position at UPS, see Tr. 225:5-15, when questioned whether the essential functions

of any position aside from that of Preload Manager was discussed at the meeting,

Matt replied, "No, we were primarily looking at the preload position."  Tr. 226:21-

25.  Matt also testified that he viewed bending, stooping, lifting packages and lowering packages as essential functions of the Preload Manager position.  See Tr. 227:9-228:14.

By memorandum drafted immediately thereafter, Fey notified Wilson of what transpired at the meeting between her, Matt and Picinich.  See Tr. 299:6-16; 216:16-217:13; Pl.'s Ex. 76.  Wilson testified that he read the memorandum shortly after it was issued on April 4, 2001.  See Tr. 685:18-686:1.  Fey, Matt and Picinich each testified, and the memorandum reflects, that the only position for which essential functions was discussed at the meeting was that of Preload Manager.  See Tr. 300:9-12; 71:3-23; 226:21-25; Pl.'s Ex. 76.  During the meeting, Picinich agreed that he could not perform the essential functions of the Preload Manager position unless staffing was different.  See Tr. 173:8-15; 891:1-6.

However, Picinich indicated that he would consider other positions, whether full or part time, as a supervisor or specialist, or even an administrative position, with the understanding that he would not receive the same pay as that of a Preload Manager.  See Tr. 893:14-894:9.  While Matt testified that the subject of a transfer was never discussed at the April 4, 2001 meeting, see Tr. 221:12-16, he also testified that it was not his responsibility to discuss the issue of transfer as a reasonable accommodation, see Tr. 221:17-22.  According to Matt, transfers and reassignments, especially filling management positions, were Wilson's area of responsibility.  See Tr. 220:23-221:4; 259:4-18.  Canavan also testified that he had the power to promote and reassign supervisors and managers.  See Tr. 542:25-543:5; 543:23-544:7.  Fey, likewise, acknowledged that at her deposition, she testified that it was the responsibility of the Human Resources and District Managers to decide whether to transfer or reassign an employee.  See Tr. 304:8-

12

306:7.  Apparently, a job freeze was in effect at UPS, commencing late March 2001, regarding which Matt was notified by Wilson on April 3, 2001.  See Tr. 74:7-25; 259:4-18; 736:5-12.  Wilson testified, however, that the job freeze would not have precluded him from offering Picinich another position as an accommodation.  See Tr. 737:1-738:9.

A UPS "accommodation checklist" was given to Picinich for his completion at the meeting.  See Tr. 891:8-893:8; Pl.'s Ex 27.  Fey testified that Picinich reluctantly complied, ultimately throwing the completed and signed form at her across the table.  See id.  See also Tr. 243:4-17.  Fey's memorandum to Wilson does not reflect that Picinich threw the accommodation checklist at her.  See Pl.'s Ex. 76; Tr. 255:5-7.  The first page of the checklist, completed by Picinich, reflects his then current position of Preload Manager, his impairment, limitations, and desired accommodations.  See Pl.'s Ex. 27.  As for desired accommodations, Picinich referred to his doctor's report.  See id.  After the meeting, Matt completed the remainder of the accommodation checklist.  See Tr. 217:20-219:1; Pl.'s Ex. 27.  Regarding Picinich's then current position, Matt answered "No" to the query whether the means existed to make the requested accommodation.  See Pl.'s Ex. 27.  Matt further wrote "N/A" or not applicable, next to the list of questions regarding transfer or reassignment, because there was a job freeze in effect at that point in time.  See id.; Tr. 244:4-22.

Fey testified that at some point after the meeting, a decision was made that UPS could not accommodate Picinich in the Preload Manager position, and that no other available positions existed which met Picinich's qualifications and restrictions.  See Tr. 894:10-20.  On April 13, 2001, Matt issued a letter to Picinich, which stated, in relevant part,

13

> [W]e are aware of no available position at UPS at this time for which
> you are qualified and capable of performing the essential job functions
> with or without reasonable accommodation.  If your condition or
> abilities change in the future, however, or if you become aware of an
> open position that you believe you are capable of performing, please
> contact me so that we may re-evaluate your situation.

Defs.' Ex. 55; Pl.'s Ex. 29.  See also Tr. 76:2-11.  Prior to sending this letter, Matt

consulted with Wilson to determine that no available positions existed for Picinich.

See Tr. 691:15-25.  According to Wilson, Fey and Matt's counterparts at the region

level, George Morrison and Cathy Walker, informed him that they evaluated

Picinich's restrictions against all potential positions at UPS.  See Tr. 689:15-

691:11.  Wilson also evaluated Picnich's restrictions against the essential functions

of positions at UPS, other than the Preload Manager position, but did not do so

while Picinich was present.  See Tr. 694:11-17; 735:5-17.  Although the April 13,

2001 letter to Picinich referenced "no available position at UPS" Wilson

interpreted same to mean the Upstate New York District of UPS, not the entire

corporation.  See Tr. 738:10-24.  Nonetheless, Wilson did not discuss his

interpretation with Matt.  See id.  In any event, Wilson never told Picinich that he

could look in another UPS district for a possible position.  See Tr. 694:18-695:3.

Picinich testified that at or about April 13, 2001, he did not know of any job

openings in the Upstate New York district.  See Tr. 175:25-176:4.

 Neither Fey nor Wilson understood the April 13, 2001 letter to terminate the

ADA process for Picinich.  See Tr. 302:3-24; 692:16-19.  According to Fey, the

UPS ADA process is complete when UPS is unable to accommodate someone.

See Tr. 302:3-24.  Although UPS determined that no reasonable accommodation

existed for Picinich, Fey understood that because the April 13, 2001 letter

informed Picinich that they would notify him if a position became available or that

he should contact them if he discovered an opening within the district, the ADA process had not yet terminated.  See id.

After discussion with Wilson, Fey completed a separation form for Picinich, which formally ended his employment with UPS, effective February 1, 2001.  See Tr. 302:25-303:18; 695:9-22; Pl.'s Ex. 79.  The form, which was signed by Fey on May 9, 2001, indicates that the reason for Picinich's termination was "long term disability" and that his rehire status was "no".  Pl.'s Ex. 79.  According to Wilson, after the separation form was completed, Picinich no longer received his full salary and health benefits.  See Tr. 697:1-7.  However, Wilson testified, if Picinich was thereafter given restrictions from his physician that would permit him to return to work, he could have done so without re-application as a new candidate.  See Tr. 696:13-17.  Nonetheless, Wilson admitted that it was typical for someone with a rehire status of "yes" to have a higher potential for rehire than someone, like Picinich, with a rehire status of "no".  See Tr. 698:9-16.  Canavan testified that he was unaware Picinich had been terminated until he was told he was being deposed in relation to this lawsuit.  See Tr. 561:17-562:2.  Canavan further testified that he was not involved in Picinich's termination, and that the district and region level human resources would have handled it.  See Tr. 562:3-16.

As far as Wilson was aware, he testified, in 2001, management positions at UPS were not publicized outside of the company.  See Tr. 720:20-25.  According to Matt, there was no procedure for listing open positions in the district, but there was one for corporate wide positions on the internet.  See Tr. 228:19-230:1.  Although Matt initially testified at trial that management positions were available on the internet, he acknowledged that at his deposition he testified that there was no procedure for posting such positions, and that the individual departments at

15

UPS would have to let people know of open positions.  See Tr. 222:11-224:16.

Picinich testified that at some point after the April 4, 2001 meeting, he asked Fey and Matt for a relocation, and informed them that he would "pick up [his] relocation (sic)."  Tr. 75:16-23.  Picinich also testified that at some point in 2000 or 2001, he told Doris Fisk, from the region, that he would be willing to relocate. See Tr. 84:17-85:19.  Wilson testified that Picinich never told him that he would cover his relocation costs.  See Tr. 767:20-22.

On or about April 23, 2001, Fey was present for, and able to listen to, a telephone conversation between Picinich and Wilson.  See Tr. 698:17-700:13; 908:17-909:13.  Fey recorded notes of the conversation during or shortly after it took place, which accurately reflect what was said.  See Tr. 908:17-909:13; Pl.'s Ex. 78.  During the April 23, 2001 telephone conversation, according to Fey, Wilson informed Picinich that the ADA process had terminated.  See Pl.'s Ex. 78; Tr. 909:14-23.  See also Tr. 798:1-5.  Wilson testified that he had no recollection of discussing any positions with Picinich during this conversation.  See Tr. 722:23-723:18.

Thereafter, a meeting took place between Picinich, Wilson and Fey on May 14, 2001, at Picinich's request as part of the UPS Employee Dispute Resolution ("EDR") policy, regarding his ADA request.  See Tr. 701:16-20; 788:17-19; 895:22-896:1.  Fey also took notes at this meeting, which accurately reflect what was said.  See Tr. 911:14-912:3.  Picinich testified that at the May 14, 2001 meeting, Wilson told him there were no available positions, although Fey's notes do not reflect that this was said.  See Tr. 77:16-22.  See also Pl.'s Ex. 80.  The notes do reflect, and Wilson's testimony confirms, that Picinich asked for a list of positions that had been filled, but Wilson denied his request.  See Tr. 703:18-24.

16

See also Pl.'s Ex. 80.  Wilson testified that he recalled Picinich mentioning his ability to perform the Security Manager position at the May 14, 2001 meeting, and Wilson further acknowledged that at his deposition, he testified that Picinich referred to other positions at that meeting.  See Tr. 701:7-701:20.  Among the positions at UPS, which Picinich testified that he believed he could perform, on or about May 14, 2001, were manager or supervisor positions in delivery information, security, claims, and customer service.  See Tr. 81:20-84:3.  However, Picinich testified that he knew of no openings in the Upstate New York district, for positions that he could perform, as of May 14, 2001.  See Tr. 176:11-177:24.

In late May 2001, Wilson spoke with Terry Champion, Human Resources manager in the Mahwah, New Jersey district, inquiring as to whether there were any available positions that could serve as an accommodation for Picinich.  See Tr. 686:19-689:13.  According to Wilson, Champion said that there were no available positions in Mahwah to meet Picinich's restrictions.  See Tr. 722:15-22.  Picinich could not recall if he knew of any available positions in Mahwah as of May 14, 2001.  See Tr. 173:3-9.  Other than speaking with Champion, Wilson did not look outside of the Upstate New York district for positions for Picinich.  See Tr. 694:2-4.

### A. Potential Available Positions

On February 1, 2001, UPS employee Tom Wolfe was promoted from Grade 14 Security Supervisor to a Grade 16 area Security Manager in the Central Pennsylvania district.  See Tr. 415:7-22; 585:5-13; 590:2-6; Pl.'s Ex. 13.  He replaced UPS employee Bev Mahalak, who was promoted to a district Security Manager in New England.  See Tr. 415:7-22; Pl.'s Ex. 13.

On or about April 4, 2001, UPS employees Phillip Glick and Kent Butler

17

underwent job reclassifications while at a phone center or centers within District number 16.  See Tr. 587:23-588:10; 590:7-13; Pl.'s Ex. 13.  Phillip Glick, Grade 14, changed from a Customer Service Supervisor to a position abbreviated as "TRN/DEV" Supervisor.  See Tr. 587:23-588:10; Pl.'s Ex. 13.  That same day, Kent Butler, went from a Grade 11 "TRN/DEV" Supervisor to a Grade 13 Customer Service Supervisor.  See id.

On July 1, 2001, UPS employee Maureen Cole changed from a Grade 14 Delivery Information Supervisor to a Grade 16 position entitled "CORP"  CSTC manager in a San Antonio, Texas phone center within UPS District 16.  See Pl.'s Ex. 13.

Finally, on May 21, 2001, UPS employee Charles Schleppy, Jr. was transferred from a Grade 14 Senior Account Executive position to a Grade 14 Customer Service Telephone Center (CSTC) supervisor position in the Laurel Mountain district.  See Tr. 584:6-24; Tr. 589:9-23; Pl.'s Ex. 13.

According to the job description for a CSTC supervisor provided by UPS, the responsibilities for this position include:

    Directing teleservice and telemarketing efforts
    Accepting and analyzing telecommunications proposals
    Forecasting manning and telecommunications needs
    Developing potential CSTC representatives
    Conducting performance reviews and on job supervision with non-
    management employees
    Training CSTC employees on new services or procedures
    Coordinating supply requisitions of Customer Service employees
    Resolving customer problems not resolved by a CSTC employee
    Maintaining acceptable cost service and performance levels for the
    telephone center
    Auditing of district telephone bills
    Completing and auditing various district and customer service reports

18

See Pl.'s Ex. 13.

Among the essential job functions for a Supervisor/Manager, including a Customer Service Supervisor/Manager and a Telephone Center Supervisor/Manager, according to the UPS Essential Job Functions Index, are "travel by personal car or plane to attend meetings at other locations" and "[b]end, stoop/squat, crouch/kneel, climb stairs and walk intermittently throughout the work day[.]" Defs.' Ex. 40. However, former UPS employee William Nalli, who worked as a Security supervisor in the Upstate New York district, testified that there is a supervisor in the phone center in that district who ambulates by wheelchair. See Tr. 823:5-824:22; 829:3-20. Finally, it is also listed as an essential function for a full time supervisor or manager to be able to "[w]ork in a seated position . . . up to 9.5 hours per day. 5 days per week[.]" Defs.' Ex. 40.

John Ventre, district Security Manager in the UPS Laurel Mountain district, who has experience working in telephone centers at UPS, testified that typically, no physical processing of packages takes place at a telephone center. See Tr. 413:11-16. Picinich, who observed the customer service department while he was a Delivery Information manager in the Upstate New York district, testified that a CSTC supervisor functions 100 percent in an office setting. See Tr. 26:10-27:11; 43:5-21. Wilson acknowledged that at his deposition he testified that a telephone center supervisor would not be required to do considerable travel. See Tr. 721:1-21. Wilson further testified that the position of Telephone Center supervisor is typically found in an office environment. See id. at 22-25.

According to the job description for a CSTC supervisor, the "academic preparation and relevant work experience" for a CSTC supervisor is as follows:

Ideally, a bachelor's degree in Business, Marketing,

> Telecommunications or related subjects
> Preferably, experience in Customer Service, Operations and Delivery Information
> Successful completion of the 30-day CSTC workshop
> Excellent interpersonal skills
> Strong oral and written communications skills

Pl.'s Ex. 13.  Picinich does not have a college degree.  See Tr. 103:22-104:2.  See also Tr. 20:20-22.  However, Picinich previously held the position of Delivery Information manager at UPS.  See Tr. 26:10-27:11.  The "academic preparation and relevant work experience" for this position is as follows:

> Ideally, a bachelor's degree in Criminal Justice or Business Management and/or a minimum of three years' functional experience -OR- a minimum of three years' job related experience combined with a minimum of one year's UPS functional experience
> Strong organizational skills
> Strong interpersonal skills
> Strong oral and written communication skills

Pl.'s Ex. 13.

### B.  UPS Policy and Costs Regarding the Transfer of Employees

Wilson testified that generally, only individuals who are at a Grade 18 or above - - at the division manager level or higher - - are transferred between districts at UPS.  See Tr. 765:6-10.  Grade 16 positions, on the other hand, are typically filled from within a district, according to Wilson.  See Tr. 766:12-16.  Although Canavan testified at trial that UPS policy allows transfers outside the district for employees at a Grade 18 or above, see Tr. 569:7-570:8, he acknowledged that at his deposition he testified that transfers from one district to another district are not limited to any particular level of employee, see Tr. 547:5-548:12.

According to Christopher Kain, former employee relations manager for the

20

Upstate New York UPS district, when a phone center closes or consolidates with another center or location, as has happened frequently since 1995, it is possible to have transfers between districts of employees in grade levels below 18.  See Tr. 601:25-602:12.  Kain also testified that, in his 27 year tenure at UPS, the only time he was transferred from one district to another is when he was promoted from a Grade 16 position in the Upstate New York district to a Grade 18 division Human Resources manager position in the Central Pennsylvania district.  See Tr. 590:17-591:20.  Kain further testified that in his experience, it is usually an individual with a Grade 18 level or higher that is transferred outside of a district.  See Tr. 591:21-592:10.

John Ventre, district Security Manager in the UPS Laurel Mountain district, testified that he was transferred from the East Long Island UPS district to the West Long Island district in 1985, when he was promoted from a Delivery Information supervisor to a Delivery Information manager, and that he transferred between districts at UPS several times thereafter.  See Tr. 405:20-407:18.  He also testified that when he was first transferred to a different district, he was promoted to a Grade 18, and that every transfer thereafter has been to a Grade 18 position.  See Tr. 416:11-417:5.

Nonetheless, UPS submitted records in response to an interrogatory which reflect several transfers between districts for employees at a Grade 16 or below.  See Pl.'s Ex. 13; Tr. 585:14-586:23.  According to these records, a list entitled "NJ District Transfers  - 2000" reflects that a series of employees at a Grade 16 or below, were transferred from different districts into District 29 at different times throughout the year 2000.  See Pl.'s Ex. 13.  All of these employees, with the exception of one, were transferred into the same position they held in the previous

district.  See id.  According to Wilson, this list reflects a consolidation of employees, for record keeping purposes, into District 29, which is the reclassified information technology district located in Mahwah, New Jersey.  See Tr. 781:2-782:17.  Wilson testified that the list does not reflect any job openings, with the exception of one union level employee, who was promoted to a Grade 14 Programmer.  See id.  Kain testified, however, that the list does reflect transfers for a district in New Jersey.  See Tr. 85:14-586:23.

Moreover, similar lists, entitled "Upstate NY District Transfers  - 2000[,]" "Central PA District Transfers - 2000" and "Laurel MT District Transfers  - 2000" all reflect a series of employees at Grade levels 16 and below, who were transferred from different districts into to District 22 (Upstate NY), District 34 (Central PA), and District 32 (Laurel MT), respectively.  See Pl.'s Ex. 13.  For the most part, these employees remained in the same grade and position, but a few were promoted in grade and position, and some were even demoted.  See id.

Finally, Picinich was promoted to Security Manager in the Upstate New York district in June 1991, after having been the acting Security Manager for the North Jersey district.  See Tr. 23:24-26:5.  Also, in the spring or summer of 1999, Picinich was asked to relocate to the Mahwah, New Jersey district, but he declined because his children were in school in the Syracuse area.  See Tr. 178:4-16.

According to Wilson, it typically costs UPS anywhere between $30,000 to $90,000 to geographically relocate an employee, and on average, it would cost them $45,000 to $50,000 to relocate a manager.  See Tr. 766:17-24.  Included in this figure are, according to Wilson, costs for real estate broker fees, closings costs, packing and moving costs, temporary living expenses, compensation for the loss of a spouse's wages, and compensation for any loss on the sale of a home.  See Tr.

22

766:25-767:19.

Wilson testified that in order for him to search for positions outside of the Upstate New York district, he would have had to undergo the very extensive process of manually contacting 55 to 60 separate human resources managers to discuss Picinich's restrictions.  See Tr. 767:23-768:9.  Wilson further testified that in April or May of 2001, there was no technology which would allow Wilson to contact all of the districts at the same time - - there was no centralized intranet or internet system available for him to do that.  See id.; Tr. 768:10-17.  However, Wilson also testified that in 2001, he had access to electronic mail at UPS, which would have allowed him to send a single message to multiple employees.  See Tr. 793:10-18.

### III.  Mental Distress

Picinich testified that after he was notified in 2001 that there were no positions he could perform at UPS, he was "totally depressed" and "became extremely, extremely sad."  Tr. 86:23-87:10.  Picinich further testified, "I just couldn't believe this was happening.  I spent going on 25 years with the company, my whole life, and now all of a sudden there was no job, which I knew there were jobs."  Tr. 87:5-7.  As a result of these feelings, Picinich sought help from a psychologist, Dr. James W. Mikesell.  See Tr. 87:11-23.  Picinich testified that he was sad, moody and angry, and that because he had problems sleeping, he was tired all the time.  See Tr. 88:4-8.  According to Picinich, his depression and resulting behaviors had a negative impact on his wife and children as well.  See Tr. 88:9-18.  In fact, according to Picinich, things got so bad that he and his wife considered separating.  See Tr. 89:4-7.

Picinich's wife, Mary Beth ("Mrs. Picinich") testified that she observed

Picinich becoming depressed after he moved to the Preload Manager position in 1999.  See Tr. 121:12-15.  Mrs. Picinich also testified that in April 2000, after Picinich was on leave from work, "he progressively was more and more withdrawn and sullen."  Tr. 121:16-122:4.  In 2001, when Picinich was told there were no accommodations for him, Mrs. Picinich testified, "[h]e was in a state of disbelief . . . [and] became even more withdrawn, he was so sad . . . [.]" Tr. 122:20-123:3.  Mrs. Picinich also testified that her husband had angry outbursts at the children around this time, and was very difficult to live with.  See Tr. 123:2-5.

According to Mrs. Picinich, her husband's depressed emotional state remained, and in the spring of 2002, at her urging, he sought help from Dr. Mikesell.  See Tr. 123:10-20.  Mrs. Picinich also testified that she accompanied Picinich to some of his counseling sessions, and that their relationship was on the mend in 2002.  See Tr. 131:15-132:2.

According to Dr. Mikesell, Picinich sought him out in the summer of 2002 for treatment of depression and family conflicts related to his recent loss of employment.  See Tr. 518:16-519:10.  Dr. Mikesell diagnosed Picinich with "depressive disorder not otherwise specified."  Tr. 519:11-15.  According to Dr. Mikesell, Picinich displayed a multitude of symptoms, including loss of sleep, difficulty concentrating, broader than normal range of emotion, lack of energy, and "vague and unformulated thoughts of suicide."  Tr. 519:18-520:5.  Dr. Mikesell testified that he believed the cause for Picinich's depression was "acute stress experienced from the loss of a job and leaving him in a very stressful situation financially with his family and so on and feeling rather helpless about how to resolve that matter."  Tr. 521:1-5.  Nonetheless, Dr. Mikesell testified that he was unaware at the time of treatment that Picinich was receiving long term disability at

24

60% of his salary plus $1833 per month in Social Security benefits.  See Tr. 525:32526:19.

Dr. Mikesell advised Picinich to pursue medication as an option, but initially Picinich was treated with counseling alone.  See Tr. 522:10-14.  Picinich's symptoms were pretty consistently present and moderately to severely acute in the summer 2002, according to Dr. Mikesell.  Tr. 15-21.  However, beginning in the fall of 2002 through 2003, Dr. Mikesell noted progressive improvement, particularly after Picinich began medication in October 2002.  See Tr. 522:22-523:2.  Also, according to Mrs. Picinich, she saw an improvement in Picinich's mood about four months after he began medication.  See Tr. 123:21-124:2.  Dr. Kahn testified that he prescribed Elavil for Picinich to facilitate sleep, and Zoloft for his depressed mood.  See Tr. 359:7-11.  Picinich's medical records reflect that Dr. Kahn prescribed these medications in fall 2002.  See Pl.'s Ex. 83.  Said records also reflect Dr. Kahn's observation that Picinich complained of a lack of sleep and that "his quality of life is 'zero'" in the fall of 2002.  See id.  According to Picinich, some of his symptoms were still present at the time of trial, and he was still taking Zoloft and Elavil.  See Tr. 89:9-20.  In the spring of 2003, Dr. Mikesell stopped treating Picinich.

## IV. Damages

As a Preload Manager, the last position Picinich held with UPS, Picinich earned $71,400 per year, or $5950 per month.  See Tr. 89:25-90:4; Pl.'s Ex. 39.  In addition, he received a holiday bonus every year in December of half of one month's salary, or $2975.  See Tr. 90:17-22; Pl.'s Ex. 40.  Picinich also received life insurance, as well as medical, dental and vision benefits for himself and his family.  See Tr. 90:6-11; Pl.'s Ex. 45.  In addition, Picinich received a retirement

25

benefit for himself.  See Tr. 90:6-11.  Finally, he received UPS and Overseas
Partners Ltd. ("OPL") stock through the Management Incentive Plan ("MIP").  See
Tr. 91:12-92:16; 93:13-20; Pl.'s Ex. 42.

According to Picinich's MIP Earnings Statements from 1995 through 1999,
the stock was typically paid in January or February following the year upon which
the incentive was based, with the exception of the 1999 MIP, which was paid in
December 1999.  See Pl.'s Ex. 42.  The shares of stock, and the value of the MIP
award, varied from year to year.  See id.  The amount of the MIP award is
calculated by multiplying an eligible employee's monthly salary by an "MIP
factor," which is determined on a yearly basis by UPS.  See Tr. 677:17-678:4.  A
one-unit factor would be used to determined the MIP award for an eligible full time
supervisor.  See Tr. 678:19-679:1.  A two unit factor is used to determine the MIP
award for an eligible manager, grade 15 or above.  See Tr. 679:2-4; 784:3-6.  Thus,
an eligible manager would receive an amount of stock valued at the two unit factor
multiplied by his or her monthly salary, minus federal, state and other taxes.  See
Tr. 679:16-680:2.  From 2000 through 2003, the one unit and two unit factors were
as follows:

|      | one unit | two unit |
|------|----------|----------|
| 2000 | 3.15     | 6.30     |
| 2001 | 2.57     | 5.14     |
| 2002 | 2.12     | 4.24     |
| 2003 | 2.01     | 4.02     |

Pl.'s Ex. 64; Tr. 784:13-16.  Picinich testified that an additional amount equal to
two and one half percent of one's monthly salary in stock would be awarded as an
incentive for employees who did not sell their UPS stock.  See Tr. 804:10-805:8.
Wilson testified that an MIP award is discretionary, and must be prefaced by an

annual recommendation from an immediate manager based on the performance and contribution of the potential recipient.  See Tr. 783:2-24.

According to Wilson's testimony, Picinich received short term disability from January 2000 until May 9, 2001, and long term disability from May 9, 2001 until January 31, 2003.  See Tr. 786:8-23.  Picinich testified that he received short term disability for one year, at the rate of his full salary, and long term disability, at 60 percent of his salary, for two years.  See Tr. 110:5-21.  Picinich also received full health benefits along with his short term and long term disability.  See id.  By letter dated January 30, 2003, UPS' then disability insurance carrier, Kemper Insurance ("Kemper"), notified Picinich that his long term disability benefit, which became effective February 1, 2001, was terminating effective January 31, 2003. See Pl.'s Ex. 59; Tr. 114:15-116:2.  The letter reflects, in relevant part, Kemper's determination that ". . . the medical records reviewed show you are able to work in a restrictive capacity in a sedentary position with frequent changes of position." Pl.'s Ex. 59. Kemper further outlined "[a] sample listing of sedentary jobs that are appropriate based on [Picinich's] previous work experience, educational level, and physical capabilities[,] includ[ing, but not limited to,] Security Manager."  Pl.'s Ex. 59.  The letter explains that this determination was made without Picinich's assistance, as his then attorney, Jennifer Smith, denied Kemper the opportunity to conduct a "Vocational Assessment interview" with Picinich.  See id.  Although the letter provides information regarding how to appeal the termination of his long term disability, because Picinich agreed with Kemper's determination, he did not contest it.  See Pl.'s Ex. 59; Tr. 111:1-9.

Picinich receives worker's compensation benefits in the amount of $800 bi-weekly, minus $40 bi-weekly for attorney fees.  See Tr. 189:13-190:11.  A

27

worker's compensation form was received into evidence, which reflects that Picinich received a total amount of $76,400 as of July 28, 2004.  See Pl.'s Ex. 53; Tr. 113:12-114:4.  Finally, Picinich has received Social Security Disability benefits continuously since 2002.  See Tr. 188:24-189:9.  His initial payment, received in 2002, was retroactive to July 2000.  See id.; Pl.'s Ex. 137.  Picinich's tax records reflect that he received a total of $52,051 from Social Security  in 2002, and a total of $22,306.20 in 2003.  See Pl.'s Exs. 51 and 52.  Included in the $52,051 initial payment from Social Security was $8615 for 2000 and $21,400 for 2001.  See Pl.'s Ex. 51.  In 2004, Picinich received approximately $1800 per month in Social Security Disability benefits.  See Tr. 189:18-24.

Picinich testified that he is vested in the UPS pension retirement plan.  See Tr. 807:9-11.  According to Picinich, had he retired at age 55, he would have received 60 percent of his pay, but because he stopped working at a younger age, his benefit will be reduced by six percent for each year below age 55.  See Tr. 806:19-807:13.  Moreover, he will not receive any medical, dental, vision or prescription drug coverage as part of his retirement benefit.  See Tr. 807:13-18.  The pay upon which his pension benefit is based is the average of his last five years of salary.  See Tr. 807:19-808:7.  Included in that are the years he received short term and long term disability benefits, which further lowers the amount of his pension.  See id.; 786:8-23.

According to Picinich, after UPS notified him that it had no positions, which he could perform either with or without reasonable accommodation, he sought employment elsewhere.  See Tr. 99:12-16.  Picinich utilized the newspaper as well as internet cites to locate jobs, and he networked with family and friends.  See id. at 17-22.  He completed a resume, and contacted prospective employers by

28

telephone, electronic mail, letter and in person.  See Tr. 101:19-103:21.  Picinich submitted copies of approximately 16 emails and letters, the latest of which was dated December 2001.  See Pl.'s Exs. 46, 47 and 48.   Picinich testified that he had several job interviews, but did not qualify for quite a few of the positions he sought because of his lack of education, and some of the positions were filled by other candidates.  See Tr. 103:22-104:7.  At least three other prospective employers, Mr. Rooter, Mr. Electric and Ryan Homes, offered Picinich employment, but, like UPS, they wanted employees to "start in the field and then move into management[]" a requirement that Picinich felt his physical limitations would not have allowed him to meet.  See Tr. 105:2-11; 18-25.

In February 2002, Picinich was offered a position with Longley Jones as an independent contractor.  See Tr. 104:16-24; 107:16-108:3.  This same month, Picinich acquired his real estate license.  See Tr. 106:22-107:15; Pl.'s Ex. 49.  However, this was not the position Picinich sought, and it was a position which required quite a bit of physical effort.  See Tr. 104:16-24.  Picinich worked in this position for several months, but stopped due to "flare ups" associated with his getting in and out of a vehicle many times per day.  See Tr. 108:4-109:14.

A vocational rehabilitation counselor, Dr. Marvin S. Reed, testified that Picinich's ability to locate employment outside of UPS is limited due to his disability.  See Tr. 461:8-462:5.  Dr. Reed stated that because of Picinich's lack of education, he is limited to jobs that require him to learn a position from the bottom up, which is difficulty for Picinich because of his physical limitations.  See id.  Although on direct examination Dr. Reed initially testified that Picinich could work until age 65 if he remained at UPS, taking reasonable accommodation into consideration, Dr. Reed later testified, under cross examination, that whether

29

Picinich remained at UPS or found alternative employment, he would likely have to retire at age 55 due to his disability.  See Tr. 470:6-473:8; 487-88; 497.  Dr. Kahn also testified that it is possible Picinich's disability would require him to retire at age 55.  See Tr. 400:9-16.

Picinich also contacted the New York State Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") for help.  See Tr. 99:20-100:15.  Picinich completed an application for vocational rehabilitation services at VESID on July 17, 2001.  See Tr. 100:16-101:13; Pl.'s Ex. 55.  On November 15, 2001, he received VESID's report and evaluation based on his application.  See Tr. 192:8-20.  VESID's report suggested that Picinich contact the Small Business Development Center and attend a seminar they offer entitled "Starting Your Own Business."  See Tr. 192:21-193:2.  Picinich met with a group of small business retirees in order to obtain advice.  See Tr. 193:4-11.  He also attended meetings and seminars on this subject and received certifications regarding starting a small business.  See id.; Tr. 206:14-24.  Picinich attempted to pursue a number of small businesses, including a "bagel restaurant."  Tr. 206:25-207:8.  Unfortunately, a lot of these businesses did not meet his requirements.  See Tr. 207:11-16.  For example, a major task associated with running the bagel restaurant is lifting 100-pound bags of flour, a function Picinich could not perform.  See id.  The VESID report and evaluation also suggested that Picinich consider obtaining a college degree in business, possibly through the Empire State College.  See Tr. 193:13-22.  Dr. Reed also testified that he thought it would be a good option for Picinich to obtain a college degree, considering that his lack of education is one hindrance to his ability to find employment.  See Tr. 503:20-505:5.  Picinich met with Empire State College, but did not enroll, nor did he enroll

30

in any college.  See id.; Tr. 194:2-3.

*V.  Reinstatement*

 Picinich testified that in 2000 and 2001, he secretly tape recorded several telephone conversations he had with different UPS employees.  See Tr. 194:4-10. Among those he recorded are Matt, Wilson and Fey, as well as Bob Dodge, Tom Dalton, Frank Detran, and Rocky Romanello.  See Tr. 194:11-195:2.  Picinich testified that he made these recordings because he was "extremely frustrated" and felt that perhaps these individuals could help him return to work.  See Tr. 58:1-7. Only one individual asked Picinich if he was being recorded, and Picinich testified that he denied that he was recording because he felt that the individual would not be truthful for fear of being retaliated against.  See id. at 1-18.

 Several UPS employees testified regarding the company's "honesty and integrity" policy.  See Tr. 247:6-10; 277:2-10; 571:16-23; 600:7-16; 662:18-663:3. On March 22, 1976 Picinich signed an "Honesty in Employment" statement, attesting that he read and understood the UPS policy regarding honesty, and that he understood his obligation and intended to assume same.  See Tr. 185:5-13; Defs.' Ex. 1.  The written policy does not explicitly mention tape recording, nor does it specifically prohibit same.  See id.; Tr. 256:4-16.  Nonetheless, Matt, Canavan, Kain and Grover, all current or former members of management at UPS, testified that Picinich's secret recording of conversations violates the honesty and integrity policy.  See Tr. 247:11-248:10; 571:24-573:5; 600:17-601:9; 663:4-664:2.  In fact, Canavan testified that such behavior would be dealt with up to and including termination, and Grover testified that the behavior would result in termination.  See Tr. 571:24-573:5; 663:4-664:2.  All of the employees expressed discomfort at the suggestion of working with Picinich in the future, with the knowledge that he

secretly taped UPS employees in the past, citing the breach of trust set forth in the honesty and integrity policy.  See Tr. 247:11-248:10; 277:11-278:1; 571:24-573:5; 600:17-601:9; 663:4-664:2.

### *Conclusions of Law*

Picinich claims that UPS failed to provide him with a reasonable accommodation and discriminatorily discharged him in violation of the Americans with Disabilities Act (ADA) and the New York Human Rights Law (NYHRL). See 42 U.S.C. § 12112 (2005); N.Y. Exec. Law § 296 (McKinney 2005).  Picinich also claims that the individual defendants, Grover, Canavan and Wilson, discriminated against him because of his disability and failed to provide him with a reasonable accommodation in violation of the NYHRL, as well as aided and abetted violations of the NYHRL.  See N.Y. Exec. Law § 296.

### I.  Claims Against UPS

####        A.  Failure to Provide Reasonable Accommodation

Pursuant to the ADA,

> [n]o covered entity[2] shall discriminate against a qualified individual
> with a disability because of the disability of such individual in regard
> to [among other things] the advancement or discharge of employees,
> employee compensation, . . . and other terms, conditions, and
> privileges of employment.

42 U.S.C. § 12112(a).  The term "discriminate" is defined by the ADA as, among other things,

> [n]ot making reasonable accommodations to the known physical or
> mental limitations of an otherwise qualified individual with a
> disability who is an . . . employee, unless [the employer] can

---

[2] An employer, such as defendant UPS, is a  "covered entity" pursuant to the ADA.  See 42 U.S.C. § 12111(2).

> demonstrate that the accommodation would impose an undue hardship
> on the operation of the business of such [employer].

42 U.S.C. § 12112(b)(5)(A).  Pursuant to the NYHRL,

> [i]t shall be an unlawful discriminatory practice for an employer . . . ,
> to refuse to provide reasonable accommodations to the known
> disabilities of an employee . . . in connection with a job or occupation
> sought or held.

N.Y. Exec. Law § 296.3(a).  The NYHRL also specifies that an employer is not

required to provide "accommodations which can be demonstrated to impose an

undue hardship on the operation of [the] employer's . . . business, program or

enterprise."  N.Y. Exec. Law § 296.3(b).

In order to prove a failure to provide reasonable accommodation claim under

the ADA and NYHRL,[3] a plaintiff must submit evidence that (1) he is an

individual with a disability as defined by the ADA, (2) defendant had notice of his

disability, (3) he could perform the essential functions of his job with reasonable

accommodation, and (4) defendant failed to make such accommodations.  See

Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 216 (2d Cir. 2001);

Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999);

Romanello v. Shiseido Cosmetics Am. Ltd., 00-Civ.-7201, 2002 WL 31190169, at

*7 (S.D.N.Y. Sept. 30, 2002), aff'd, No. 02-9212, 2003 WL 21728998 (2d Cir.

July 23, 2003).  The court previously granted partial summary judgment to

Picinich on the first two elements of his failure to accommodate claim.  See

Picinich I, 321 F.Supp. at 503.  Therefore, Picinich has the burden to prove the

latter two elements of his failure to accommodate claim.  However, UPS can defeat

---

[3] Both Picinich's ADA and state law claims against defendant UPS will be considered
together, as the analysis under the NYHRL "parallels that used in the ADA context."  Lovejoy-
Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 212, n.3 (2d Cir. 2001).

Picinich's claim of failure to accommodate if it can establish "(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." See Mitchell, 109 F.3d at 6. See also Romanello, 2002 WL 31190169 at *7.

### 1. Qualified Individual With a Disability

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under Second Circuit precedent, "the plaintiff bears the burden of production and persuasion on the issue of whether [he] is qualified for the job in question." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 137 (2d Cir. 1995). Thus, Picinich must prove that he can perform the essential function of a position at UPS without assistance, or "that an accommodation exists that permits [him] to perform the job's essential functions." Id. at 138.

Essential functions are defined by regulation as those duties which are fundamental to the position in question, and not merely marginal. See Jackan v. New York State Dep't of Labor, No. 97-CV-0483, 1998 WL 760266 at *7 (N.D.N.Y. Oct. 26, 1998), aff'd, 205 F.3d 562 (2d Cir. 2000), quoting Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997); 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential for several reasons, including, for example, because the reason for the existence of the position is to perform that function, because of the limited number of employees available among whom that function can be distributed, or because of the highly specialized nature of the function. See § 1630.2(n)(2). According to the ADA, "consideration shall be

34

given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). In addition, the applicable regulation provides that:

> [e]vidence of whether a particular function is essential includes, but is not limited to . . . [t]he amount of time spent on the job performing the function; [t]he consequences of not requiring the incumbent to perform the function; [t]he terms of a collective bargaining agreement; [t]he work experience of past incumbents in the job; and/or [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

However, the employer's identification of a function as essential is only one consideration for the court when determining whether an employee is qualified for a position under the ADA. "To avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into *both* the employer's description of a job and how the job is actually performed in practice." Young v. Central Square Cent. Sch. Dist., 213 F.Supp.2d 202, 213 (N.D.N.Y. 2002), quoting Borkowski, 63 F.3d at 140 (emphasis added).

### 2. Failure to Provide Reasonable Accommodation

The ADA defines "reasonable accommodation" as, among other things, "job restructuring, . . . reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). According to the applicable regulation, "reasonable accommodation" means, among other things:

> [m]odifications or adjustments to the work environment, or to the

> manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or . . . [m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).

In order to make out a prima facie case of failure to accommodate, Picinich must demonstrate that UPS refused to make a reasonable accommodation.  See Mitchell, 190 F.3d at 6.  UPS was not required to provide any particular accommodation Picinich requested, only some accommodation, as long as it was reasonable.  See Fink v. New York City Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995); Romanello, 2002 WL 31190169 at *8.  "[A]n accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce."  Borkowski, 63 F.3d at 138.  The plaintiff bears only the burden of production as to the reasonableness requirement, however, such that it is "enough for [him] to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  Id.  The defendant's burden of persuasion as to the question of whether an accommodation is reasonable effectively merges with its affirmative defense of undue hardship.  See id.

The ADA envisions that employees and employers will work together in "an informal, interactive process . . . [which] should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  See 29 C.F.R. § 1630.2(o)(3).  See also Lovejoy, 263 F.3d 208, 218-219; Jackan, 205 F.3d at 566.  While a plaintiff has the burden of identifying an accommodation, the defendant is obliged to take affirmative steps to

36

assist the plaintiff in this process.  See Jackan, 205 F.3d at 568 n.4.  Included in this obligation is the requirement that the defendant communicate with the plaintiff in good faith.  See Mengine, 114 F.3d at 420.  Nonetheless, courts have not "found the interactive process to be an independent source of liability irrespective of whether a reasonable accommodation was actually offered (or conversely, irrespective of whether one was actually possible).  Rather, the failure to engage in an interactive process is relevant only where it leads to the more fundamental failure to provide an accommodation."  E.E.O.C. v. Yellow Freight System, Inc., No. 98-CV-2270, 2002 WL 31011859, at *24 (S.D.N.Y. Sept. 9, 2002) ("Yellow Freight"), citing Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001).

In order to show that UPS failed to participate in the interactive process, Picinich must demonstrate that (1) UPS knew about his disability, (2) he requested accommodations or assistance for his disability, (3) UPS did not make a good faith effort to assist him in seeking accommodations, and (4) he could have been reasonably accommodated but for the lack of good faith.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-320 (3d Cir. 1999).  However, where an employer makes reasonable efforts to communicate with an employee, liability under the ADA will not attach, and likewise, where the employee causes the interactive process to collapse, the employer will not be liable.  See Donofrio v. New York Times, 99-CV-1576, 2001 WL 1663314 at *6-7 (S.D.N.Y. Aug. 24, 2001) (Mag. J. Francis), adopted by, 2002 WL 230820 (S.D.N.Y. Feb. 14, 2002); Economou v. Caldera, 99-Civ.-12117, 2000 WL 1844773 at *23-24 (S.D.N.Y. Dec. 18, 2000).

Here, Picinich argues in his post trial submissions that Defendants failed to accommodate him in April 2000 when he returned to the Preload Manager position

37

because he could have performed the essential functions of that job with proper staffing. Defendants argue in their post trial submissions that in April 2000, they voluntarily temporarily modified the Preload Manager position by removing some of the essential functions of that job because they understood Picinich's restrictions to be temporary. Defendants further contend that Picinich failed to follow their direction to work within his medical restrictions, and that he could have instructed another UPS employee to handle any physical task outside of those restrictions.

As an initial point, the evidence suggests that Defendants knew or should have known that Picinich's restrictions were permanent, and as such, they were required to provide him with a reasonable accommodation. The evidence also shows that Grover believed Defendants were accommodating Picinich by instructing him to work within his restrictions. Moreover, Grover testified that the physical duties associated with the Preload Manager position were not essential functions of same, and that Picinich could "direct and manage a building without doing those - - those particular physical items." Tr. 623:3-5. Finally, the evidence reflects that Defendants told Picinich that a part time Preload Supervisor would be available to assist him. While the part time supervisor scheduled to work in preload on the day Picinich returned to work had recently undergone knee surgery, it appears that Defendants did not know, nor could they have known of this fact. Nonetheless, the evidence reflects that Defendants knew that Picinich would be working a full time shift, but failed to ensure that sufficient staffing would be available to assist him with the physical demands of the position. The Defendants knew or should have known that there was only one part time supervisor scheduled to work, leaving Picinich without assistance for at least half of his full time shift. As such, the court finds that in April 2000, Picinich could have performed the

38

essential functions of the Preload Manager position with a reasonable accommodation, but that Defendants failed to provide him with same.  As a result of Defendants' failure to accommodate Picinich, his condition worsened such that his physician found him unable to work in any position either with or without an accommodation until January 5, 2001.

Picinich further argues that Defendants failed to accommodate him after January 2001, when they discovered that he could not perform the essential functions of the Preload Manager position, but failed to reassign him to a vacant, non operations, management level position.  Picinich identifies four such positions, of which he alleges he could perform the essential functions.  Defendants argue that Picinich could not perform the essential functions of the positions he identifies.  Moreover, Defendants argue, Picinich fails to identify a vacant position that he is qualified to perform within the Upstate New York district, and a reassignment of Picinich to any position outside that district would have been an undue hardship to Defendants, and therefore, not a reasonable accommodation.

In order to establish that UPS failed to accommodate him by transfer to another position, Picinich must establish that a vacancy existed for a position of which he could perform the essential functions.  See Jackan, 205 F.3d at 568, citing Mengine, 114 F.3d at 420.  Once Picinich meets this burden, judgment in favor of UPS will not be appropriate unless it  makes a showing that it provided some other accommodation, or alternatively, that a transfer would cause it undue hardship. See Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999); Borkowski, 63 F.3d at 142.

Picinich contends that in January 2001, he was capable of performing the essential functions of the following four management level positions at UPS:

39

Customer Service Telephone Center Supervisor, Customer Service Supervisor, Delivery Information Supervisor, and Security Manager. Picinich argues that he has identified vacancies for each of these positions. On February 1, 2001, a Security Manager position was filled in the Central Pennsylvania district. However, considering that Picinich requested an accommodation on January 5, 2001, and that the UPS ADA procedure understandably allows for the gathering and analysis of medical information, as well as meeting with the employee, prior to identification of reasonable accommodations, it would be inappropriate for the court to find that UPS should have identified the Security Manager vacancy and placed Picinich in that position by February 1, 2001.

Picinich contends that a vacancy existed for the Customer Service Supervisor position on April 4, 2001 at a UPS telephone center. However, the evidence does not establish that a vacancy existed, but instead, that an employee's job title was reclassified from TRN/DEV Supervisor to Customer Service Supervisor. Picinich also contends that there was a vacancy for a Delivery Information Supervisor in a San Antonio, Texas telephone center on July 1, 2001. The court need not spend much time evaluating whether such a vacancy existed, as Dr. Kahn found Picinich unable to work in any position at UPS, even with an accommodation, from June 26, 2001 until August 28, 2001.

The only position identified by Picinich for which an actual vacancy existed during a time when he was released to work by his physician, and when UPS was at a point in their 10-step ADA procedure that identification of such a vacancy was appropriate, is the Customer Service Telephone Center ("CSTC") Supervisor position. The evidence reflects that on May 21, 2001, a CSTC Supervisor position was filled in the Laurel Mountain district. Although Defendants argue that

40

Picinich cannot perform the essential functions of this position, the evidence reflects that the functions Defendants identify as essential, to wit, "bend, stoop/squat, crouch/kneel, climb stairs and walk intermittently . . ." are marginal, not fundamental duties of the CSTC position.  In fact, the description of a CSTC Supervisor provided by UPS includes managerial responsibilities that do not require the aforementioned physical functions identified by Defendants in their post trial submissions. In addition, considering the testimony of Picinich and Wilson that the position is typically performed in an office setting, and the testimony of William Nalli that there is a UPS employee who performs the functions of a similar position while ambulating by wheelchair, it is likely that Picinich would be able to complete the duties of a CSTC Supervisor while remaining within his work restrictions.

As for the academic and work related experience desired for a CSTC Supervisor position, it is important to note that while Picinich does not have a bachelor's degree, he does have many years of experience in management at UPS, including as a Delivery Information manager, for which a bachelor's degree is also considered "ideal" according to the UPS job descriptions list.

For all of these reasons, the court finds that Picinich has met his burden to identify a vacant position for which he was qualified to perform the essential functions either with or without an accommodation, effective May 21, 2001.

Defendants argue, however, that reassigning Picinich to this position would have been unreasonable because they do not have a policy of transferring employees to other districts unless they are at least a Grade 18, and because such a transfer would have been an undue hardship to Defendants.

Because the intent of the ADA is not to give disabled employees preferential

41

treatment, reassignment of a disabled employee to another facility is a reasonable accommodation only where it is the regular practice or policy of the employer to transfer employees between facilities or where the employer is contractually obligated to do so.  See Lovejoy-Wilson, 263 F.3d at 218; Bates v. Long Island R.R. Co., 997 F.2d 1028, 1035-1036 (2d Cir. 1993).  See also Emrick v. Libbey-Owens-Ford Co., 875 F.Supp. 393, 398 (E.D. Tex. 1995).

Defendants contention that they have a policy of transferring employees outside of a district only when an employee is in a Grade 18 position or is being promoted to a Grade 18 position is dubious.  First, the claimed policy is not in writing.  In addition, while many UPS employees testified that they were only transferred outside of a district when they were promoted to a Grade 18 position, there is ample evidence that Defendants have transferred employees between districts at Grade levels below 18.  Therefore, the court finds that there was no policy or contractual bar to Defendants' reassigning Picinich outside of the Upstate New York district.

The ADA defines "undue hardship" as "an action requiring significant difficulty or expense," when considered in light of (1) the nature and cost of the accommodation, (2) the overall financial resources of the facility, the number of employees, the effect on expenses and resources, or the impact on operations, (3) the overall financial resources of the employer, the overall size of its business with respect to the number of employees, the number, type and location of its facilities, and (4) the type of operations of the employer, including the composition, structure, and functions of the workforce, geographic separateness, administrative or fiscal relationship of the facilities in relation to the employer.  See 42 U.S.C. §

12111(10).[4]  These factors are expounded upon by regulation to provide for
"taking into consideration the availability of tax credits and deductions, and/or
outside funding" when evaluating the nature and net cost of the accommodation.
29 C.F.R. § 1630.2(p)(2)(i).  The regulations prescribe as an additional
consideration "[t]he impact of the accommodation upon the operation of the
facility, including the impact on the ability of other employees to perform their
duties and the impact on the facility's ability to conduct business."  §
1630.2(p)(2)(v).

 The evidence submitted by Defendants in support of their contention that
transfer of Picinich outside of the Upstate New York district would have been an
undue hardship is scarce.  Testimony from Wilson, a defendant in this case, reveals
that it costs UPS $30,000 to $90,000 to transfer an employee outside of a district.
Wilson further testified that the process of locating a vacancy for Picinich would
have been very time intensive, requiring him to separately contact 55 to 60 district
Human Resources managers to inquire about possible vacant positions which
would meet Picinich's restrictions.  The court finds that this contention is due little
weight, if any at all, considering Wilson's testimony that he had access to
electronic mail which would have allowed him to contact multiple Human
Resources managers with one message.  As for Wilson's testimony about the
financial cost of a transfer, such testimony, coupled with other evidence submitted
regarding the corporate structure of UPS, does not adequately address the factors
set forth in the ADA and accompanying regulations.  For example, no evidence
whatsoever was submitted to the court regarding the overall financial resources of
the Upstate New York district, or the corporation as a whole.  The court concludes,

---

[4] NYHRL sets forth similar considerations in § 296.3(b)(i)-(iii).

therefore that Defendants have failed to meet their burden to prove that the costs of a transfer would outweigh the benefits.  As such, a transfer of Picinich to the CSTC Supervisor position in the Laurel Mountain district would not have been unreasonable, and Defendants failure to effect such a transfer was a violation of the ADA.

### B.  Discriminatory Discharge

The term, "discriminate" is defined by the ADA as

> denying employment opportunities to . . . a[n] employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee.

42 U.S.C. § 12112(b)(5)(B).  Pursuant to the NYHRL,

> [i]t shall be an unlawful discriminatory practice for an employer . . . , because of the . . . disability . . . of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296.1(a).

The analysis of a claim for discriminatory discharge is the same under the ADA and NYHRL.  See Parker, 204 F.3d at 332 n.1.  Picinich bears the burden of establishing his claim for discriminatory discharge, the elements of which mirror those of his first cause of action for failure to make a reasonable accommodation. See id., citing Stone, 118 F.3d at 96-97.  Where a plaintiff establishes the first three elements of his failure to accommodate claim, a defendant's failure to make reasonable accommodation  "amounts to discharge because of his disability."  Id., citing Ryan, 135 F.3d at 870.  Here, Picinich argues in his post trial submission that Defendants terminated him on May 9, 2001 after failing to provide a

reasonable accommodation.  Because Picinich established the elements of his failure to accommodate claim, and because Defendants failed to meet their burden to establish undue hardship, Defendants are also liable to Picinich on his claim of discriminatory discharge.  See id.

## II.  Claims Against Individual Defendants

### A.  NYHRL § 296.1(a) - Discriminatory Discharge & NYHRL § 296.3 - Failure to Provide Reasonable Accommodation

Pursuant to the NYHRL, it is "an unlawful discriminatory practice" for an employer "to discharge from employment" or "to discriminate against [an] individual in compensation or in terms, conditions or privileges of employment" because of, among other things, disability, see § 296.1(a), or to "refuse to provide reasonable accommodations to the known disabilities of an employee," see § 296.3.  The analysis of these NYHRL claims are identical to the analysis of claims pursuant to their counterparts in the ADA.  See Lovejoy-Wilson, 263 F.3d at 212, n.3; Parker, 204 F.3d at 332 n.1.

As an initial matter, the court must decide whether each of the individual defendants here may be deemed an "employer" within the meaning of the NYHRL. A corporate supervisor or manager may be subject to personal liability under NYHRL § 296 only where said supervisor or manager has been deemed an employer within the meaning of the NYHRL.  The court denied summary judgment as to the NYHRL claims against the individual defendants on the basis that questions of fact existed regarding whether those defendants could be deemed an employer under that statute.  See Picinich I, 321 F.Supp.2d at 518-19.

According to the New York Court of Appeals, a corporate manger or supervisor is not considered an employer pursuant to NYHRL unless he is shown to have (1) an ownership interest in the corporation or (2) any power to do more

than carry out personnel decisions made by others.  See Patrowich v. Chemical Bank, 63 N.Y.2d 541, 542, 473 N.E.2d 11, 483 N.Y.S.2d 659 (1984) (emphasis added).

The Court of Appeals set forth an "economic reality" test for determining whether a defendant constitutes a plaintiff's employer pursuant § 296 under the second prong set forth in Patrowich, to wit, whether an individual supervisor or manager has the power to do more than carry out personnel decisions made by others.  See Heinemann v. Howe & Rusling, 260 F.Supp.2d 592, 598 (W.D.N.Y. 2003), citing Patrowich, 63 N.Y.2d at 544.  Under this test, the factors courts should consider are whether the individual supervisor or manager (1) had the power to hire or fire employees, (2) supervised and controlled employee work schedules or employment conditions, (3) determined the rate and methods of payment, and (4) maintained employment records.  See id.  However, no single factor of this test is dispositive, as "economic reality is based on all the circumstances."  Heinemann, 206 F.Supp.2d at 598, quoting Herman v. RSR Sec. Servs., Ltd., 172 F.3d 132, 139 (2d Cir. 1999).

Picinich argues that the individual Defendants in this case are employers because they each own stock in UPS, and because each had the power to do more than carry out personnel decisions made by others.  Defendants argue that not every stockholder of a corporation is an owner for purposes of NYHRL violations.  See Salomone v. Merrill Lynch & Co., Inc., 96-Civ.-6570, 1998 WL 151036, at *3 (S.D.N.Y. Mar. 31, 1998).  However, a lack of ownership interest alone is not dispositive under Patrowich, and defendants may still be considered employers where they do more than carry out personnel decisions.  See Patrowich, 63 N.Y.2d at 542.  Nonetheless, unlike the defendant in Salomone, who was merely entitled to

stock options, here the individual defendants own actual stock in UPS.  See Salomone, 1998 WL 151036, at *3.[5]  Moreover, each defendant clearly had the ability to do more than merely carry out personnel decisions.  Fey testified that the Human Resources manager and the District manager make the decisions about whether to relocate or reassign an employee.  See Tr. 305:13-306:7.  Moreover, Canavan testified that as District manager, he had the power, with the Region manager, to promote supervisors and managers.  See Tr. 543:23-544:3.  Canavan further testified that he had the authority to reassign employees.  See Tr. 544:4-7.  Grover testified that as District Human Resources manager, he had the responsibility for hiring all union employees, and that he had the authority to promote part time supervisors within his department.  See Tr. 607:10-608:1.  Also a District Human Resources manager, Wilson testified that he provided input into decisions regarding promotion of persons to management level positions.  See Tr. 681:2-10.

For the aforementioned reasons, the court finds as a matter of law that Canavan, Grover and Wilson were each an employer within the meaning of the NYHRL during all relevant times.

Defendants further argue, however, that Picinich has not provided evidence that Canavan, Grover or Wilson directed an improper personnel decision such that any one of them could be held individually liable.  The evidence clearly reflects that Grover was involved in the decision to return Picinich to the Preload Manager

---

[5] Wilson testified that in 2001 he owned approximately 4800 to 5000 shares of UPS stock, valued at approximately $350,000.  See Tr. 723:22-724:11.  Grover testified that in 2000 he owned approximately 16,000 shares of UPS stock.  See Tr. 633:10-21.  Finally, Canavan testified that in 2000 he owned approximately 50,000 to 55,000 shares of UPS stock, and approximately 55,000 to 58,000 in 2001.  See Tr. 562:17-563:1.

position in Aptil 2000 without sufficient staffing.  The evidence further reflects that Wilson was directly involved with the UPS ADA procedure regarding Picinich, which commenced in January 2001, and that he was directly involved in the failure of UPS to locate the CSTC Supervisor vacancy and transfer Picinich into that position in May 2001.  However, the evidence of Canavan's involvement in either NYHRL violation is not as clear.  While Grover testified that he discussed Picinich's return to work with Canavan prior to the April 7, 2000 meeting, there is no evidence that Canavan directed Grover to return Picinich to the Preload Manager position without appropriate staffing.  Moreover, there is no evidence that Canavan was involved in Wilson's decision to not search for vacant positions for Picinich outside of the Upstate New York district.

For these reasons, the court finds as a matter of law that Grover is individually liable to Picinich on his NYHRL failure to accommodate claim for his role in Picinich's April 2000 return to work, and that Wilson is liable to Picinich on both his failure to accommodate and discriminatory discharge claims under the NYHRL for his role in failing to locate, and transfer Picinich to, a vacant position in May 2001.  Finally, the court finds as a matter of law that Canavan is not individually liable to Picinich on either of his NYHRL failure to accommodate or discriminatory discharge claims.

### B.  NYHRL § 296.6 - Aid or Abet Violation of NYHRL

In order for a plaintiff to recover against an aider or abettor of NYHRL violations pursuant to § 296.6, he must establish "(1) that [the defendant] engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination."  Beattie, 124 F.Supp.2d at

805, citing Tomka, 66 F.3d at 1317.  Further, plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself."  Jordan v. Cayuga County, No. 01-CV-1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004), quoting Bennett v. Progressive Corp., 225 F.Supp.2d 190, 213 (N.D.N.Y. 2002) (internal quotation and emphasis omitted).  It is true, as Picinich notes in his post trial papers, that the Court of Appeals for the Second Circuit has not definitively resolved the issue of whether an individual may aid or abet his own conduct.  See Jordan, 2004 WL 437459, at *4.  Nonetheless, courts in this district "have so far disproved of" such a theory.  See id., citing Bennett, 225 F.Supp.2d at 214 (internal citations omitted).

Therefore, because the court concludes that Grover and Wilson are liable for violations of the NYHRL related to Picinich's April 2000 return to work and his January 2001 ADA request, respectively, neither defendant may be held liable for aiding and abetting same.  Moreover, as previously addressed, there is no evidence that Canavan participated in the NYHRL violations during either the April 2000 or post January 2001 periods, and therefore as a matter of law, he is not liable to Picinich on his aiding and abetting claim under § 296.6 of the NYHRL.

### III.  Damages and Relief

Picinich initially requests that the court order Defendant UPS to reinstate him to a sedentary, management level, non-operations/staff position in the continental United States.  Alternatively, Picinich requests an order awarding front pay.  In addition, Picinich requests an order awarding back pay, compensatory damages for mental and emotional distress and attorneys' costs and fees.

Pursuant to the ADA, Title VII remedies apply to any employment discrimination claim alleged on the basis of a disability.  See Muller v. Costello,

49

997 F.Supp. 299, 304-305 (N.D.N.Y. 1998), citing 42 U.S.C. § 12117(a).  Where, as here, the plaintiff proves his employment discrimination claim, he is entitled to relief including compensatory damages, declaratory judgment and injunctive relief. See id. at 305, citing Doane v. City of Omaha, 115 F.3d 624 (8th Cir.1997).

### A.  Reinstatement

Picinich requests that the court order his reinstatement.  Defendants oppose this request, arguing that the after acquired evidence doctrine requires a finding that Picinich should not be reinstated because he would have been terminated due to his violations of company policy.  In addition, Defendants argue that reinstatement would be inappropriate because of the animosity that exists between Picinich and Defendants as well as other UPS employees.

The ADA provides for reinstatement as a remedy where, as here, an employer unlawfully discriminates against an employee based on disability.  See 42 U.S.C. § 12117; 42 U.S.C. § 2000e-5(g)(1).  Likewise, the NYHRL allows for reinstatement.  See N.Y. Exec. Law § 297.9 (McKinney 2005).  "If appropriate, reinstatement is the preferred remedy rather than front pay."  Muller, 997 F.Supp. at 305 citing Selgas v. American Airlines, Inc., 104 F.3d 9, 12 (1st Cir. 1997). However, reinstatement is not always feasible, and in such cases, the court may order front pay, or future lost earnings, as an alternative.  See Banks v. Travelers Cos., 180 F.3d 358, 364 (2d Cir. 1999).[6]  One example of a situation that would

---

[6] It is true that Banks deals with remedies under the ADEA, not, as here, the ADA.  See Banks, 180 F.3d at 363-366.  Nonetheless, "the ADA is part of the same broad remedial framework as the ADEA and Title VII, and [] all the anti-discrimination acts have been subjected to similar analysis[.]"  Miller v. Public Storage Management, Inc., 121 F.3d 215, 218 (5th Cir. 1997), citing Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 396 (5th Cir. 1995); Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 957 n. 4 (5th Cir. 1993).

warrant an award of front pay instead of reinstatement is where "animosity may impede the resumption of a reasonable employer-employee relationship." Id., citing Kirsch v. Fleet St. Ltd., 148 F.3d 149, 169 (2d Cir. 1998); Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir. 1984).  The court finds that such a situation is present in this case.  Numerous UPS employees, most of which are not defendants in this case, testified that Picinich's secret tape recording of conversations created an atmosphere of distrust.  Fey and Matt testified that during their April 2001 meeting with Picinich, he threw the accommodations checklist form across the table at Fey.  Kain testified that Picinich trespassed on UPS property in June 2002, when he and another gentleman pushed passed Kain in order to serve papers on Fey regarding another legal matter unrelated to the present case.  See Tr. 597:20-600:6.  While the court declines to conclude that Picinich's behavior would have resulted in his termination, it nonetheless contributed to the animosity between Defendants, other UPS employees and himself.  Therefore, reinstatement is not warranted, and Picinich's request for same is denied.

### B.  Mitigation

Defendants contend that any award of back pay or front pay should be reduced because Picinich failed to mitigate his damages.  Picinich disagrees, arguing that he properly mitigated his damages by attempting to find other employment, and by applying for, and receiving, disability benefits.

Both the ADA and NYHRL require a victim of employment discrimination, such as Picinich, to mitigate his damages .  See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998).  Where, as here, an employee is discharged, he "must 'use reasonable diligence in finding other suitable employment,' which need not be comparable to [his] previous positions."  Id., quoting Ford Motor Co. v.

51

E.E.O.C., 458 U.S. 219, 231-231 & n.15, 102 S.Ct. 3057, 3065-66 & n.15 (1982).
Typically, it is the employer's duty to demonstrate that suitable employment
existed in the marketplace but that the plaintiff made no reasonable effort to find it.
See Greenway, 143 F.3d at 53-54.  However, the Second Circuit has recently
reiterated its adoption of the rule that were the employer can demonstrate that the
plaintiff's efforts to locate suitable employment were not reasonable, it is released
from the obligation to prove that suitable employment existed.  See Broadnax v.
City of New Haven, 415 F.3d 265, 266-270 (2d Cir. 2005), citing Greenway, 143
F.3d at 54.  Here, the evidence reflects that Picinich's attempts to find other
employment were short lived, and not extensive.  To be sure, his vocational
rehabilitation counselor testified that Picinich's disability and lack of education
limit his ability to locate comparable employment.  Nonetheless, the evidence
reflects that Picinich's job search was limited in size and time, and that he failed to
heed VESID's advice to further his education.  After February 2002, when he
stopped working for Longley Jones, there is no evidence that Picinich made any
further attempts to locate employment or improve his qualifications in the job
market.  For these reasons, the court concludes that effective March 1, 2002,
Picinich's attempts to mitigate damages ceased.  As such, Picinich is not entitled to
an award of front pay.

### C. Back Pay

In an employment discrimination action such as this, the purpose of
awarding damages is to make the plaintiff whole.  See Greenway, 143 F.3d at 54,
citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d
280 (1975).  See also Gilbert v. Hotline Delivery, No. 00-CV-160, 2001 WL
799576, at *2 (S.D.N.Y. July 10, 2001).  Both the ADA and the NYHRL provide

for an award of back pay to a victim of employment discrimination.  See 42 U.S.C. § 12117; 42 U.S.C. § 2000e-5(g)(1).

An award of back pay is an equitable remedy subject to the court's sound discretion, to be guided by the legal principles of the ADA.  See Ford Motor Co., 458 U.S. at 226, 102 S.Ct. at 3063.  Back pay is typically measured from the date of termination until the date of judgment, and includes lost salary, raises and fringe benefits.  See Yellow Freight, 2002 WL 31011859, at *28.  While an award of back pay may be reduced for any period of time that the plaintiff was unable to work due to disability, such is not the case where, as here, said disability would not have occurred but for the defendants' ADA violation.  See Bennett v. Emerson Elec. Co., 186 F.Supp.2d 1168 (D. Kan. 2002), citing Whatley v. Skaggs Cos., Inc., 707 F.2d 1129, 1138 n.8 (10th Cir. 1983).  Here, Picinich's condition worsened after his attempt to return to work in April 2000 due to Defendants' failure to accommodate him at that time.  As such, notwithstanding his periods of total disability, Picinich is entitled to back pay from April 2000 until February 2002, when his search for employment ceased.

The award of back pay is to be computed at the rate of Picinich's salary as Preload Manager, plus his holiday bonus for 2000 and 2001, MIP benefits for 2000 and 2001, and health insurance, offset by his worker's compensation, social security disability, and his short term and long term disability benefits, including the health benefits he received in conjunction therewith.  The court's back pay and front pay award is illustrated as follows:

| | |
|---|---|
| Preload Manager salary at $5950 per month | $136,850 |
| Holiday bonus for 2000 and 2001 | $5950 |
| MIP for 2000 (6.3 x $5950) | $37,485 |
| MIP for 2001 (5.14 x $5950) | $30,583 |

| | | |
|---|---|---|
| Health insurance | | $13,301.63 |
| | Subtotal | $224,169.63 |
| | | |
| Worker's compensation ($1733.33 per month) | | ($39,866.59) |
| Social Security | | |
|     2000  (July through December) | | ($8,615) |
|     2001 | | ($21,440) |
|     2002 (January & February) | | ($3,666) |
| Short term disability (through January 2001) | | ($59,500) |
| Long term disability (February 2001 through | | |
|     February 2002) | | ($46,410) |
| Health insurance | | ($13,301.63) |
| | Offset subtotal | ($192,799.22) |
| | | |
| | Total back pay and | |
| |     front pay due | $31,370.41 |

Defendants are likewise ordered to increase Picinich's pension credits as though he was paid his full salary through February 2002.  See Yellow Freight, 2002 WL  31011859, at *31-32.

### D.  Compensatory Damages

Compensatory damages for personal injury, pain, suffering, or mental anguish are provided for by the ADA, as well as the NYHRL.  See id. at *33, citing 42 U.S.C. § 1981(a)(1); Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848, 121 S.Ct. 1946, 1949 (2001); Landgraf v. USI Film Prods., 511 U.S. 244, 253, 114 S.Ct. 1483, 1491 (1994).  See also N.Y. Exec. Law § 297.9.  Where, as here, a demand for compensatory damages is based on mental anguish, courts should fashion an award "in an amount that fairly compensates the victim of discrimination for [his] injuries."  Walia v. Vivek Purmasir & Associates, Inc., 160 F.Supp.2d 380, 390 (E.D.N.Y. 2000), citing Johnson v. Hale, 13 F.3d 1351, 1352-53 & n. 2 (9th Cir. 1994).  In order to determine an amount that will fairly

compensate the plaintiff, "courts 'have considered the duration, severity, consequences and physical manifestations of the mental anguish, as well as any treatment that plaintiff underwent as a result of [his] anguish.'" Walia, 160 F.Supp.2d at 390, quoting Gleason v. Callanan Industr., Inc., 203 A.D.2d 750, 752, 610 N.Y.S.2d 671, 673 (3d Dep't 1994).

Here, the court has before it ample evidence of mental anguish beyond the testimony of Picinich himself.  Mrs. Picinich testified that her husband was withdrawn, sad, sullen, and had unprovoked angry outbursts.  In addition, Dr. Mikesell treated Picinich with counseling for about one year, and consulted with Dr. Kahn, who prescribed medication for Picinich.  Dr. Mikesell also testified that he diagnosed Picinich with a depressive disorder, and that Picinich exhibited symptoms of depression such as loss of sleep, difficulty concentrating, broader than normal range of emotion, lack of energy, and thoughts of suicide.  Although Picinich did not seek treatment for his depression until a few months after he stopped searching for employment, there is evidence that his symptoms began as early as April 2000, and that they worsened in the spring and summer of 2001.  As such, the court finds that the evidence warrants an award of compensatory damages to Picinich in an amount of $50,000.

### E.  Interest

Picinich requests prejudgment interest on his award of back pay and compensatory damages.  Whether to award prejudgment interest, including the rate to be applied, is within the court's discretion.  See Collins v. Suffolk County Police Dept., 349 F.Supp.2d 559, 565 (E.D.N.Y. 2004), citing Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998).  However, in cases where the damage award is for lost wages, it is generally an abuse of discretion not to also award prejudgment

interest.  See Collins, 349 F.Supp.2d at 565, citing Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371, 375 (2d Cir. 2000).  See also Yellow Freight, 2002 WL 31011859, at *32.  "While prejudgment interest awards in discrimination cases are most commonly applied to back pay, courts also exercise their discretion to award prejudgment interest on compensatory damage awards when interests of fairness and full compensation to the plaintiff so require."  Robinson v. Instructional Systems, Inc., 80 F.Supp.2d 203, 207 (S.D.N.Y. 2000) (citations omitted).  The court finds that such interests exist here.  Finally, in cases such as this one, where the underlying award is made for violations of both the ADA and the NYHRL, "it is common practice in the Second Circuit to apply the federal interest rate pursuant to 28 U.S.C. § 1961(a)."  Collins, 349 F.Supp.2d at 565 (citations omitted).

The court grants an award of prejudgment interest on the award of back pay, as well as the award of compensatory damages.  The Clerk of the Court shall compute prejudgment interest according to the following formula.  First, the awards shall be divided pro rata for the period April 2000 through February 2002, and the interest compounded annually.  Second, prejudgment interest shall be computed based on the United States treasury bill interest rate set forth in 28 U.S.C. § 1961(a).  Finally, the interest shall be compounded annually.  In addition, Picinich should receive interest for the period between the end of the back pay and compensatory damages period, to wit, March 1, 2002, and the date judgment is entered.  "This amount will be calculated based on the average annual Treasury bill rate of interest for the period of [April 2000 through February 2002], will also be compounded annually, and will apply to the subtotal arrived at after adding the compounded interest for the [total award] period to the [total award] principal."  Yellow Freight, 2002 WL 31011859, at *33.  See also Robinson, 80 F.Supp.2d at

56

208.

### F. Attorney's Fees and Costs

Finally, Picinich requests an award of attorney's fees and costs. The ADA provides for an award to a prevailing party of "a reasonable attorney's fee, including litigation expenses, and costs[.]" 42 U.S.C. § 12205. Picinich is directed to make an application to the court for such costs, expenses and fees with proof of same.

## IV. Conclusion

It is ORDERED that judgment be entered in favor of Plaintiff, Richard M. Picinich, against Defendant, United Parcel Service on Plaintiff's first cause of action for failure to provide a reasonable accommodation in violation of the ADA and NYHRL; and it is further

ORDERED that judgment be entered in favor of Plaintiff, Richard M. Picinich, against Defendant, United Parcel Service on Plaintiff's second cause of action for discriminatory discharge in violation of the ADA and NYHRL; and it is further

ORDERED that judgment be entered in favor of Plaintiff, Richard M. Picinich, against Defendants, Jim Grover and Jeffery Wilson on Plaintiff's third cause of action for failure to provide reasonable accommodation in violation of the NYHRL; and it is further

ORDERED that judgment be entered in favor of Plaintiff, Richard M. Picinich, against Defendant, Jeffery Wilson on Plaintiff's third cause of action for discriminatory discharge in violation of the NYHRL; and it is further

ORDERED that judgment be entered in favor of Defendant, Jim Grover, on Plaintiff's third cause of action for discriminatory discharge in violation of the

NYHRL; and it is further

ORDERED that judgment be entered in favor of Defendant, Brendan Canavan, on Plaintiff's third cause of action for failure to provide reasonable accommodation and discriminatory discharge in violation of the NYHRL; and it is further

ORDERED that judgment be entered in favor of Defendants, Jim Grover, Brendan Canavan, and Jeffrey Wilson on Plaintiff's third cause of action for aiding and abetting a violation of the NYHRL; and it is further

ORDERED that judgment shall include an award to Plaintiff, Richard M. Picinich, of $31,370.41 in back pay and $50,000 in compensatory damages, with prejudgment interest to be calculated by the Clerk of the Court according to the formula set forth above; and it is further

ORDERED that within 45 days of the entry of judgment, Defendant, United Parcel Service shall make contributions to Plaintiff, Richard M. Picinich's pension fund that it would have made if Plaintiff had received his full salary as Preload Manager from April 2000 through February 2002; and it is further

ORDERED that Plaintiff is entitled to an award of post judgment interest to be calculated by the Clerk of the Court in accordance with 28 U.S.C. § 1961(a); and it is further

ORDERED that Plaintiff is entitled to an award of attorney's fees in accordance with 42 U.S.C. § 12205, Plaintiff is directed to submit to the court within 45 days after entry of judgment an application to the court for such costs, expenses and fees with proof of same.


IT IS SO ORDERED.

DATED:      December 23, 2005
            Syracuse, New York


_____
Neal P. McCurn
Senior  U.S. District Judge